Filed 05/14/26

VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-03108

---

Killington Center Owners Association, Inc. et al v. Jacob McGrath et al

---

## DECISION AND ORDER ON PENDING MOTIONS

Four motions are before the Court in this commercial dispute: (1) Defendants' Motion for Summary Judgment Dismissing the Complaint, filed October 21, 2025; (2) Plaintiff's Motion for Summary Judgment, filed December 19, 2025; (2) Plaintiff's Motion, filed February 6, 2026, for Leave to File a Sur-Reply in Opposition to Defendants' Motion; and (4) Defendants' Motion to Strike Plaintiff's Sur-Reply, filed February 17, 2026.

For reasons that follow, Defendants' Motion for Summary Judgment is *granted*; Plaintiff's Motion for Summary Judgment is *denied*; Plaintiff's motion for leave to file a sur-reply is *granted*; and Defendants' motion to strike is *denied*.

### Introduction

The Plaintiff in this action is Killington Center Owners' Association, Inc. ("Association"), a Vermont nonprofit corporation. The Association is the association of all the owners of units or "shares" at a condominium development known as Killington Center. The Defendants in this action are Killington Vacation Rentals, Inc. ("KVR"), a property management services company, and Jacob McGrath, an officer of KVR and a key manager of its operations. Under a services contract that is a subject of this litigation, KVR had been engaged for several years in providing property management services to the Association, as well as assisting the Association with certain managerial and operational functions.

Defendants now seek a summary judgment on its affirmative defense of lack of corporate capacity. The theory of this defense is that the significant transactions or "business" of a corporate entity like the Association, such as bringing a lawsuit on behalf and in the name of the corporation, must be duly authorized by the board of directors of the corporation. The Defendants' motion, without addressing any of the Association's claims on the merits, requests that the Association's entire lawsuit be thrown out on grounds that it was not authorized by the Association's Board of Directors.

### Summary Judgment Record

There are no material facts appearing in the record that are in genuine dispute. The adjudication of Defendants' motion turns on the meaning and effect of certain "governing instruments" of the Association, and the existence and contents of such instruments are not disputed. Indeed, the Association seeks a summary judgment in its favor with regard to the "lack of corporate capacity" defense, and tellingly, the Association did not file any Rule 56(c)(1) statement of facts in support of its motion. Ordinarily, such an omission might be cause for outright denial of a motion for summary judgment. But

here, given that the bulk of the record consists of undisputed instruments that neither party suggests are ambiguous and which are construed as a matter of law, the Association's approach appears reasonable.

Thus, the Court summarizes here the provisions within the governing instruments that are material and then summarizes other undisputed facts that are ascertained from outside those instruments.

I.   Governing Instruments

The Association was created pursuant to a Declaration of Condominium that was drafted and recorded by the declarant/developer in 1987. *See* Defs.' Ex. 2 ("Declaration"), at 1, 16-17. Section 11.5 of the Declaration provides that the Association "shall be governed by and operate in accordance with the procedures set forth in the Bylaws" that are attached as Schedule "C" to the Declaration. Section 1.4 of the Bylaws provides as follows:

> The Owners' Association of Killington Center shall be a single Owner's [sic.] Association, and shall include two separate Divisions, the Residential Unit Owners' Division and the Commercial Unit Owners' Division. Each of the Divisions shall have its own Board of Directors, elected by the Unit Owners of the Units in the respective Divisions, that is, the Residential Unit Owners shall elect the directors of the Residential Division and the Commercial Unit Owners shall elect the Directors of the Commercial Division. Each Division shall undertake administration of their respective Areas, that is, the Residential Unit Owners' Division shall govern and administer the Residential Common Areas; the Commercial Unit Owners' Division shall govern and administer the Commercial Common Areas; and the Owners' Association shall govern and administer all other Common Areas referred to herein as the General Common Areas. With respect to matters affecting the General Common Areas, or in the event of a conflict between the policies, procedures, regulations or assessments established by the Commercial or Residential Divisions, and the policies, procedures, regulations or assessments established for the General Common Areas or the Condominium as a whole, such conflict shall be resolved by the Board of Directors of the Association. Actions, decisions, rules, regulations and assessments adopted by the Directors of the Association as a whole shall prevail over any contrary or conflicting action, decision, rule, regulation or assessment of either of the Divisions.

Defs.' Ex. 2 at Sched. C, § 1.4. The Declaration similarly provides that the Association "shall include two separate Divisions, the Residential Unit Owners' Division and the Commercial Unit Owners' Division," *id.* at 17, § 11.3, and that "[w]ith respect to any matters affecting the General Common Areas, or in the event of a conflict between the policies, procedures, regulations or assessments established by the Commercial or Residential Divisions, such conflict shall be resolved by the Directors of the Association." *Id.* at 18, § 11.3.

This allocation of decision-making power and control is reiterated in a section of the Declaration that addresses voting by Unit Owners, as follows:

> [E]ach Unit Owner shall, by virtue of such ownership, be entitled to vote with respect to matters pertaining to the Division in which such Unit Owner owns a Unit, including, without limitation, the election of Directors for each Division; the foregoing notwithstanding, the Board of Directors, and not the Unit Owners individually, shall act to resolve matters affecting the condominium as a whole, including disputes between the Divisions. All voting by Unit Owners shall be by and within the respective Divisions . . . .

*Id.* at 19, § 11.6. *See also id.* at Sched. C (Bylaws), § 2.5 (at a joint meeting of all Unit Owners, "matters affecting the Condominium as a whole" are subject to "review and discuss[ion] . . . provided that all decisions, policies, rules and procedures pertaining to such matters shall be enacted or adopted by the Board of Directors of the Association . . . .").

Section 3.1 of the Bylaws addresses the Association's Board of Directors, as follows:

[T]he Association shall be governed by a Board of Directors consisting of seven persons, all of whom shall be owners or co-owners of Units. Three Directors for each Division shall be elected at the first meeting of the Unit Owners of each Division, and the remaining required Director shall be designated by the Directors of the respective Divisions; . . . .

Defs.' Ex. 2 at Sched. C, § 3.1. Section 3.5 of the Bylaws defines a quorum for the transaction of business as follows: "At any meeting of the Directors of each Division, and/or the Board of Directors, a majority of the members thereof shall constitute a quorum for the transaction of business."

The Declaration indicates the Killington Center development included 22 Residential Units and two Commercial Units, with additional Residential Units to be constructed in later phases, at the declarant's discretion. *See* Defs.' Ex. 2, at 5 & 13, §§ 6.1, 10.1; *id.* at Sched. B. The Declaration allocated to each of these Unit Owners an undivided ownership interest in the Common Areas and Common Elements of the Condominium, as follows: a Residential Unit owner would own a 2.273 percentage interest; each Commercial Unit owner would own a 7.143 percentage interest; and the declarant would hold the remaining interests and allocate them to subsequent units, if and when constructed. *See id.*, Sched. B ("Interim Schedule of Percentage Interests"). Thus, the Residential Division collectively held a 50% interest, the Commercial Division held 14.28%, and the declarant retained the balance.[1]

In August of 1990, Amendment No. 2 to the Declaration was adopted, as follows:

In the event the Units in either Division are owned by fewer than three different persons, the number of Directors representing such Division shall be equivalent to the number of persons owning such units, not to exceed a total of three Directors, provided that in the event fewer than three Directors represent a Division the three votes to which the Directors of such Division would be entitled shall be allocated equally among the Directors of such Division. For example, if all the Commercial Units are owned by the same person, that person shall be the Director representing the Commercial Division and shall be entitled to three votes at a meeting of the Board of Directors of the Association.

Defs.' Ex. 2 ("Amendment to Declaration of Condominium," dated Aug. 21, 1990).[2]

II. Additional Facts

The following facts appear undisputed in the record:

---

[1] The record shows that the development today includes 22 Residential Units. Under Amendment Nos. 4 and 6 to the Declaration, adopted in 1994 and 1996, respectively, a "Management Building" was established and declared as a separate condominium unit within the Residential Division, and that new unit was allocated a 2.17% undivided ownership interest in the Common Areas and Common Elements of the Condominium.

[2] Though captioned as an "Amendment To Declaration of Condominium," the terms of this document indicate that it constitutes an amendment to "Section 3.1 of the Bylaws of the Killington Center Condominium."

In 1992, a Vermont corporation solely owned by Mr. Stephen H. Durkee acquired the two Commercial Units of the Condominium. Defs.' Resp. to Pl.'s Rule 56(c)(2) Statement of Add'l Facts, ¶ 4 & Exs. E-6 & E-7. Mr. Durkee was subsequently elected by the Commercial Division to a position on the Association's Board of Directors, and he served on the Board until 2007. *Id.* ¶¶ 4, 13, 32. From 2007 to the present, Mr. Durkee has ceased attending Board meetings and all other association proceedings. *Id.* ¶ 13.

As of July 26, 2024, the Association's Board of Directors lacked an "at-large" or "designated" member. *Id.* ¶ 30. On that date, three Directors who had been recently elected by the Residential Division held a duly noticed meeting—which Mr. Durkee did not attend—and voted to appoint Mr. Brian Ferguson, a Residential Unit Owner, to the at-large directorship. *Id.* ¶ 31. Subsequently, these four Directors (the three elected members and Mr. Ferguson) unanimously voted to approve filing the Complaint in this action. *Id.* ¶ 39. The Complaint was filed in August of 2024.

Analysis

I.   The Quorum Issue

The core issue regarding the lack of corporate capacity is whether three elected Directors from the Residential Division, acting in the absence of Mr. Durkee and without an at-large Director, may constitute a quorum for the transaction of corporate business. Defendants maintain that with seven total directorships, a quorum is met only where there are four Directors, all duly in office, in attendance at a meeting of the Board. Thus, the three Directors from the Residential Division lacked a quorum to appoint Mr. Ferguson to the vacant at-large position. That defect made his appointment invalid, and also rendered void all subsequent business purportedly transacted by the Board, including the authorization of this lawsuit.

The Association argues that the number of directorships of the Board may and does vary, depending upon the number of different persons who own shares within a particular ownership class or category. The Association reads Amendment No. 2 to the Declaration to mean that where, as here, all of the Commercial Units are owned by a single person, the number of directorships allocated to the Commercial Division is likewise reduced, from three to one. This automatically changes the quorum calculation as well, such that a quorum is met not by a majority of seven directorships (*i.e.*, by four Directors in attendance), but merely by a majority of five directorships (*i.e.*, three Directors in attendance). Under this interpretation, the three elected Directors who met on July, 26, 2024, had a quorum and legitimately appointed Mr. Ferguson as the at-large Director.

The Association also argues that if the Court adopts Defendants' position on the quorum issue, that would allow a minority interest stakeholder (Mr. Durkee) to exert disproportionate power and control over the Association, and effectively "hold hostage" the majority of Unit Owners, who also own a majority ownership interest in the Condominium.[3]

---

[3] The Association maintains that the 22 Residential Unit Owners presently hold an 85% interest in the common areas and common elements of the Condominium. Under the Declaration, the declarant was required amend the Declaration within seven years after it was recorded with a "Schedule of Final Percentage Interests," essentially showing each Unit Owner's percentage of ownership, with no further revisions permitted. *See* Defs.' Ex. 2, at 5-6, §§ 6.1-6.2. There is no indication from the record that this was ever done. Thus, it is not clear that the Residential Unit Owners collectively hold an 85% interest today. In any event, the Association's point remains: if Defendants' view of the quorum requirement prevails, then Mr. Durkee, relative to his ownership stake, enjoys disproportionate power and control on the Board of Directors, and therefore disproportionate power and control with respect to transactions or decisions affecting the Association as a whole.

## II. By Statute, a Quorum Consists of a Majority of the Number of Directorships Specified In the Association's Bylaws.

The parties correctly observe that principles of contract law govern this Court's construction of the Bylaws and the Declaration. However, as the parties also observe, the Association is subject to two bodies of statutory law: (1) the acts pertaining to condominiums and common interest communities, at Titles 27 and 27A of the V.S.A.; and (2) the Vermont Nonprofit Corporation Act ("VNCA"), at Title 11B of the V.S.A.[4] A leading corporate law treatise counsels that, because corporate bylaw provisions "are subject to a large body of state law," one should not easily presume "that courts will actually treat bylaws exactly as they would a contract." 8 *Fletcher Cyclopedia of the Law of Corporations* § 4166 (Westlaw, Sept. 2025 update). In this case, one of the statutes is dispositive.

Section 8.24 of the VNCA, entitled "Quorum and voting," indicates that where (as here) a corporation's bylaws specifies or fixes the number of directorships, a quorum is a majority of that specific number. That provision provides, in part:

> Unless the articles of incorporation or bylaws require a greater number, a quorum of a board of directors consists of:
>
> (1) a majority of the fixed number of directors if the corporation has a fixed board size; or
>
> (2) a majority of the number of directors prescribed, or if no number is prescribed the number in office immediately before the meeting begins, if the corporation has a variable-range size board.

11B V.S.A. § 8.24(a).

Here, Section 3.1 of the Association's Bylaws specifies that "seven" is the size of the Association's Board of Directors. The Bylaws do not establish a variable-range size Board (*e.g.*, "not fewer than three nor more than seven, as may be prescribed"). By application of statute, therefore, a quorum is where there are four Directors in attendance at a Board meeting, not three.

Accordingly, the Association and Board are paralyzed. Mr. Durkee's long-standing "boycott," as Defendants call it, combined with the vacant at-large directorship, have prevented the authorization of any corporate business for many years.

## III. The Bylaws Also Indicate That A Quorum of the Board Is Four.

Furthermore, even absent the VNCA, the Bylaws themselves require a quorum of four Directors, not three. The governance structure established through the Bylaws was designed to guarantee an irreducible level of representation and voting power, on the Board of Directors, for each class of Unit Owner. By creating two distinct classes of stock, by giving each class an equal amount of representation on the Board, and by vesting the Board with the exclusive authority to act on matters affecting the whole

---

[4] The VNCA was enacted in 1996 and was derived from the Revised Model Nonprofit Corporation Act, a model drafted in 1987 by the American Bar Association. *See* 1995, No. 179 (Adj. Sess.), eff. Jan. 1, 1997 (codified at Vt. Stat. Ann. tit. 11B, §§ 1.01-17.05).

Association, the Bylaws ensured that the owner of the minority interest in the Condominium retained a degree of control over such matters. That control and power was indeed disproportionate to the number of shares and the quantum of ownership interest held by that "minority" ownership class. By comparison, those with a majority ownership interest (here, the Residential Owners' Division) were unable to exercise their collective majority power—which they held in both numbers of shares (units) and in extent of ownership interest—through any direct, Condominium-wide vote on matters affecting the whole Association.[5]

These features of corporate governance were intentional: "This approach is widely used in closely held corporations to effect an agreed upon allocation of control, for example, to ensure minority representation on the board of directors by issuing to that minority a class of shares entitled to elect one or more directors." Revised Model Business Corporation Act, at § 8.04 – Official Comments (Spring 1984, ABA Committee On Corporate Laws).[6] In essence, the rights of the minority interest ownership class were "baked into" the Association's corporate governance documents, and that very "recipe" controls still today.

The inclusion of the at-large directorship position was no less critical to the corporate governance structure. The at-large Director was to serve as the tie-breaker, in the event the two Divisions became deadlocked on an issue, or where (as here) all the Directors from one Division did not attend a Board meeting. The at-large Director's attendance would serve to constitute a quorum, assuming three elected Directors were also present. Moreover, because the at-large Director was to have been jointly appointed by Directors who were already elected to office from their respective Divisions, the at-large Director would not represent or serve any particular class or constituency of owners, but rather the "common interests" of all Unit Owners. For that reason, the at-large Director would be positioned to offer at least a minimal degree of fair representation a Board meeting, even if an entire Division or class of owners was not directly represented by any of their elected Directors at a Board meeting. Accordingly, that the at-large directorship was left vacant in this case was a critical omission, since had it been filled, Mr. Durkee's boycott would not have necessarily prevented a quorum.

---

[5] There are discrepancies within and between the governing instruments as to whether the Board is comprised of five or seven members. *Compare* Defs.' Ex. 2 at Sched. C, § 3.1 (quoted above, "seven") *and* Defs.' Ex. 2, "Amendment to Declaration of Condominium," dated Aug. 21, 1990 (each of two Owners' Divisions may be represented on the Board with up to three different persons elected to directorships), *with* Defs.' Ex. 2 at Sched. C, § 3.1 ("The fifth Director (selected by the other Directors) shall serve for a term of two (2) years."), *and id.* at 18 (Declaration), § 11.4 ("the Association shall be governed by a Board of Directors consisting of five members, two of whom shall be elected by the Residential Unit Owners, two by the Commercial Unit Owners, and the fifth shall be chosen by the other four directors"). Plaintiff considers these discrepancies to be scrivener's errors, *see* Pl.'s Opp'n at 2, and it appears that those Residential Unit Owners who elected three Directors to office in 2024, in an effort to address the governance problem, did so on the presumption that they had three directorships to fill, not just two. In any event, the determination of this issue is not dispositive; the controlling issue is that each Owners' Division was allocated an *equal* number of seats (either two, or three, for each) on the Board of Directors.

[6] Title 11A V.S.A. § 8.04, a provision within the Vermont Business Corporation Act, was derived verbatim from § 8.04 of the ABA's Revised Model Business Corporation Act. And 11B V.S.A. § 8.04, a provision within the VNCA, is identical to 11A V.S.A. § 8.04. With regard to the design of corporate governance, Plaintiff has represented that the declarant/developer was also the original owner of the Commercial Units. If so, the Bylaws appear to have been designed to enable that declarant/developer to raise and obtain a significant amount of capital (through the sale of residential stock to the general public), but without losing control over matters affecting the whole Condominium. Far from unlawful, as suggested by Plaintiff, *see* Pl.'s Opp'n at 11, this appears to have been a deliberate business strategy of an insider or founder.

The Association's reliance on the 1990 Amendment to the Declaration is mistaken. That Amendment does not change the Bylaws' fixed total of seven directorships, nor does it alter the allocation of three Directors per Division. The Amendment's express language, specifying that the number of Directors in office from each Division would "not . . . exceed a total of three," means the number of directorships specified in the Bylaws for each Division (three) was unchanged by the Amendment, regardless of the number of different persons who may own shares from a Division. The Amendment was enacted to clarify that if less than three different persons own all the shares within a Division, the number of Directors *in office* from such Division is accordingly reduced, down to two or one, as the case may be.[7] The Amendment also made clear that if the number of different persons owning shares from one ownership class falls below three, the voting power on the Board remains at three votes, to be allocated equally between two owners, or held by the sole owner.

Indeed, 1990 Amendment was plainly about *preserving* the minimum representation and voting power of each separate class or category of owner on the Board of Directors. The construction urged by the Association is antithetical to that purpose. For example, if the quorum requirement were adjusted downward to require just three Directors in attendance from one class of shareholders, then a Board meeting could go forward to transact the business of the whole Association in the complete absence of the at-large Director and any Director from the other ownership class.[8]

Accordingly, the Association lacks property authority from its Board of Directors to transact corporate business.

IV. Equitable Relief

Lastly, the Association argues that adopting the Defendants' interpretation of the governing instruments would paralyze the Association and leave it and all the shareholders with no recourse. For that very reason, the Association urges the Court to construe the governing instruments in a manner that would allow a path forward, noting that a minority interest Director's mere refusal to participate in Board proceedings cannot have been intended to result in complete corporate dysfunction. *See* Pl.'s Sur-Reply, at 3. The Association also asserts that the recently-elected Directors acted "in good faith" and with "transparency" when trying to resolve governance issues, and that the Defendants were partly at fault for the Association's predicament. The Court interprets these arguments as a plea for equitable relief, and the Court is also cognizant of the maxim that "equity abhors a forfeiture." *See Standard Packaging Corp. v. Goodrich*, 131 Vt. 57, 59 (1972). However, the Court declines this plea, for two related reasons.

First, the law of contracts, even contract-law doctrines grounded in equity, do not supply a suitable remedy here. To be sure, the doctrines of impracticability or impossibility appear applicable to this situation. *See Restatement (Second) of Contracts* § 261 (1981) (stating doctrine of impracticability due to supervening event). The boycott of all Board meetings by a Director who owns all the shares from a particular ownership class or Division, coupled with the vacancy of the at-large directorship, might be seen as "the occurrence of event[s] the non-occurrence of which w[ere] a basic assumption on which" the Declaration and Bylaws "w[ere] made." *Id.*

---

[7] In that sense, the Amendment recognizes what is an elementary, but still essential, point—that one person can hold one just directorship at a time on a Board consisting of several "persons."

[8] Furthermore, the Association has not articulated why a mere increase or decrease in the number of different persons owning the same (limited) number of Commercial Units (two), holding the same aggregate percentage of ownership interest in the Condominium (14.28%), and holding the same voting power on the Board (three votes), should affect the quorum requirements of the Board.

The problem with such an analogy, however, is that impracticability or impossibility of performance, if found, merely results in a "discharge" of a contracting party's "duty to render th[e] performance" that has become impracticable or impossible due to a supervening event. *Id.* Here, the Declaration or the Bylaws are not in the nature of bilateral contracts, or a mutual exchange of promises. Those instruments are more legislative in nature. As our Supreme Court has observed, a declaration of condominium "'is the master deed that prescribes the rules of the game,'" by "'defin[ing] the rights and duties of the developer, the owners of the individual condominium units and the management body of the [development] project.'" *Madowitz v. The Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 23, 188 Vt. 197 (alterations added; quoting, respectively, *CBK Brook House I Ltd. P'ship v. Berlin*, 834 N.E.2d 1251, 1253 n.4 (Mass. App. Ct. 2005), and *Thompson v. Ebbert*, 160 P.3d 754, 756-57 (Idaho 2007)); *see also* 8 *Fletcher Cyclopedia of the Law of Corporations* § 4166 ("Bylaws are the rules and regulations or private laws enacted by the corporation to regulate, govern and control its own actions, affairs and concerns and its shareholders or members and its directors and officers with relation to each other and among themselves in their relation to the corporation."). Thus, the doctrine of impracticability or impossibility does not offer a suitable remedy.

This conclusion is reinforced by a unique provision within the VNCA. Section 1.42 of the VNCA (11B V.S.A. § 1.42), entitled "Judicial relief," allows a director, officer, delegate, shareholder, or the Attorney General to file a petition in Vermont Superior Court requesting temporary relief on fair and equitable terms, sufficient to allow a completely dysfunctional nonprofit corporation to regain the capacity to operate again. The drafters of that provision characterized it as an "'escape valve allowing nonprofit corporations to conduct meetings or obtain the consent of members, delegates or directors when it is otherwise impractical or impossible to do so.'" *Bd. of Dirs. of Alpaca Owners & Breeders Ass'n, Inc. v. Clang*, 80 P.3d 945, 947 (Colo. App. Div. V 2003) (quoting official comments to § 1.60 of Revised Model Nonprofit Corporation Act (1987), at 45-46)). Section 1.42 is quite detailed and appears to reflect considerable deliberation and care on the part of its drafters.

The existence of this unique equitable lifeline in Vermont's corporate law statutes is by negative implication an indication to the Court that it lacks authority to simply re-write or re-construe the Association's governance documents, so as to find that the Association's lawsuit in this case was properly authorized.

## ORDER

> Accordingly, therefore, the Court GRANTS Defendants' motion for summary judgment on its lack of corporate capacity defense and hereby ORDERS that Plaintiff's entire Amended Complaint be DISMISSED.

> Plaintiff's motion for summary judgment is DENIED.

> Plaintiff's motion for leave to file a sur-reply is GRANTED; and Defendants' motion to strike is DENIED.

> This Order does not address Defendants' counterclaims, which remain pending. The parties are ordered to file an updated case management schedule within 30 days of this Order. If the parties are unable to stipulate to an agreed schedule, they may file separate proposed schedules.[9]

---

[9] The Court urges the parties, when addressing case management and scheduling issues, to consider (jointly if possible) how this lawsuit is or will be affected by this Court's determination that the Association now lacks corporate capacity, and has lacked such capacity for what appears to be all relevant time periods (*i.e.*, since well

Electronically Signed on: Thursday, May 14, 2026 pursuant to V.R.E.F. 9(d).

_____
Susan A. McManus
Superior Court Judge

---

before Defendants became involved in performing services for the Association, or what Defendants thought was the Association).